## UNITED STATES BANKRUPTCY COURT
## FOR THE
## WESTERN DISTRICT OF KENTUCKY

| | | |
|---|---|---|
| IN RE: | ) | |
| | ) | |
| CHRISTOPHER LEE SMITH | ) | CASE NO.  17-10067(1)(12) |
| | ) | |
| Debtor(s) | ) | |
| | ) | |
| EDMONTON STATE BANK | ) | AP NO.  17-1010 |
| | ) | |
| Plaintiff(s) | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| CHRISTOPHER LEE SMITH, *et al.* | ) | |
| | ) | |
| Defendant(s) | ) | |

### MEMORANDUM-OPINION

This matter came before the Court for an evidentiary hearing regarding the status of two tobacco pole barns on the property owned by Debtor, Christopher Lee Smith ("Debtor").  The Court considered the testimony of the witnesses and exhibits presented on behalf of Debtor, Plaintiff Edmonton State Bank ("ESB"), Defendant South Central Bank ("SCB") and Defendant Pinnacle Agricultural Distribution, Inc. ("Pinnacle"), as well as the arguments presented by counsel representing each of the parties.  For the following reasons, the Court concludes the two tobacco pole barns on Debtor's property were permanent fixtures that became part of the real estate upon which ESB had a valid real estate mortgage.  An Order accompanies this Memorandum-Opinion.

**FACTS**

On or about August 27, 2008, the Debtor and Andrea Smith gave a Conventional Real Estate Mortgage ("Mortgage")  to ESB in the principal sum of $412,000.  The Mortgage covered 96.810 acres of real property owned by the Debtor and Andrea Smith in Barren County, Kentucky located on Lyon School Road (also referred to herein as "the Farm").

ESB recorded its Mortgage in the records of the Barren County Clerk's Office in Glasgow, Kentucky.  ESB is the first mortgage holder on the Farm.

Debtor's father, Lonnie L. Smith, executed a personal guarantee for his son in favor of ESB in the amount of $214,000.

Several years after Debtor entered into the Mortgage with ESB, Debtor built two large tobacco pole barns on the Farm.  Debtor borrowed the funds to construct both barns.  The construction was not financed by an additional mortgage, but was secured by other means.

The barns were huge structures each being 42 x 388 feet.  They were used for curing tobacco grown on Debtor's farm.  The barn design is a simplistic construction, common to the area, with a cedar wooden frame and posts covered by a metal roof and metal partially covering the sides of the barn.  The tobacco is hung from the roof trusses to dry or cure.

The Debtor testified that the first pole barn was constructed by Amish workers in 2010.  The second barn was built in 2014 by Chad Starkes.  Both were similarly constructed.  The first barn had cedar posts with a piece of metal rebar inside the posts which attached to concrete piers.  The second pole barn had a concrete foundation poured in a space about two feet below the ground surface.  The poles of the second barn sat atop the concrete surface and were held in place by the sheer (enormous) weight of the building.

Both barns were constructed using "pole barn nails". Pole barn nails have metal shanks that circle the bolt or rod of the nail and run the length of the nail that act as a wedge or anchor to prevent separation of the attached timbers. The very purpose of the shanks is to increase friction. Testimony at trial established that pole barn nails cannot be simply pulled out of the posts once they are secured, such as can be done with smooth rod carpenter nails.

The metal siding on the barns covered the roof and down the sides to about five or six feet from the ground. The purpose of the open space from ground level up five to six feet was to allow air to flow through the barn to cure the tobacco. Tractors and/or trucks are driven through the barns to haul in fresh cut tobacco or remove cured tobacco.

Lonnie Smith, Debtor's father, has been in the commercial construction business for 43 years. Although he does not build pole barns, he is familiar with their construction. Mr. Smith testified that the pole barn nails have the ring shanks and that once they are put into the posts, "there's no getting them out." According to Mr. Smith, removing the pole barn nail would tear up the wood to the point where the wood would no longer be useful.

The Debtor testified that he could pull out a pole barn nail or use a reciprocating saw to cut the nails to prevent destruction of the timber at the point of attachment. Lonnie Smith disagreed with the Debtor's assessment that a pole barn nail can be extracted without significant damage to the timber and further opined that a reciprocating saw would require the attached timbers to be separated enough to get the saw blade between the timbers. To this witness, using a reciprocating saw to cut the nails and dismantle the barn for reuse was wholly impractical and would result in the destruction of the wood.

Noel Elmore, a long-time tobacco farmer in the area, testified that he also had pole barns on his farm. His pole barns are roughly two-thirds the size of Debtor's and are constructed in a manner similar to one of Debtor's barns where the posts sit on a concrete foundation. He estimates that Debtor's barns probably held 24,000 tobacco plants. He estimated that average tobacco quality weight per plant is 25 to 30 pounds (high quality would be up to 50 pounds per plant). Therefore, if Debtor's barns were filled with average quality tobacco, they would carry weight of no less than 30 tons. The barns have to be of sturdy construction to carry this weight. Mr. Elmore also testified that once the pole barn nails are placed into the posts, they cannot be pulled out without destroying the wood. He also testified that it would not be practical to use a reciprocating saw to pull them out. Mr. Elmore has lived and raised tobacco in Barren County, Kentucky, for 75 years. Barren County is the largest tobacco producing county in Kentucky and there are many of these types of barns in the county. When asked what he would do with the materials from a dismantled pole barn, Mr. Elmore suggested he would have it burned in place. He had never heard of anyone moving a tobacco pole barn once it is constructed.

Debtor testified it was his intent to dismantle the barns and reconstruct them on another farm, once he stopped farming tobacco. However, the greater weight of trial testimony established that dismantling the barns would destroy them and it would not be economically feasible to dismantle and reconstruct them.

On December 17, 2016, a windstorm destroyed both tobacco pole barns on Debtor's farm.

On January 20, 2017, Debtor's insurance company, Everett Cash Mutual Insurance Company ("ECM"), issued two checks, one for $129,000 and one for $130,000, for the loss of each barn. The checks were issued with Debtor, ESB and SCB as payees on each of the checks.

On June 1, 2012, May 10, 2013, April 18, 2014 and May 14th and 20th, 2015, SCB advanced Debtor and Andrea Smith $118,459.71, $132,000, $75,000, $90,000 and $150,000, respectively. Debtor and Andrea Smith executed and delivered to SCB, promissory notes evidencing each loan. To secure repayment of the loans, Debtor granted SCB a security interest in all of his farm equipment and business machinery.   SCB filed UCC Financing Statements with the Kentucky Secretary of State's Office.

On or about August 31, 2016, Pinnacle obtained an Agreed Judgment against Debtor in the amount of $327,278, plus attorney fees and expenses based upon a loan it made to Debtor, upon which he defaulted.  Pinnacle filed a Proof of Claim in Debtor's bankruptcy and contends its claim is secured by a lien on Debtor's crops and equipment, as evidenced by a UCC Financing Statement filed with the Kentucky Secretary of State's Office.

On January 31, 2017, Debtor filed his Voluntary Petition seeking relief under Chapter 12 of the United States Bankruptcy Code.  As part of the Debtor's Chapter 12 bankruptcy, the Farm was sold by auction.

On August 25, 2017, ESB instituted this adversary proceeding seeking a declaratory judgment regarding the liens asserted by ESB, SCB and Pinnacle in the insurance proceeds issued by ECM after the destruction of the barns.

ESB contends it is entitled to the insurance proceeds based on the fact that the pole barns are permanent improvements to the Debtor's realty and covered by the ESB mortgage.

SCB contends the pole barns were Debtor's farm equipment covered by its security agreement and protected by the UCC Financing Statement filed with the Kentucky Secretary of State.

Pinnacle contends its lien, which secured Debtor's indebtedness to it, encumber the insurance proceeds issued on the barns.

## LEGAL ANALYSIS

The issue before the Court is whether the two tobacco pole barns on Debtor's farm that were destroyed by wind on December 17, 2016, were permanent improvements to the realty and therefore, covered by ESB's mortgage or were movable farm equipment upon which SCB and Pinnacle's security interests attached.  Based upon the testimony and documentary evidence presented at the evidentiary hearing, the Court determines the pole barns were permanent improvements to the realty and subject to ESB's mortgage.

The analysis as to whether the tobacco pole barns on Debtor's farm were realty or personalty requires a review of Kentucky law since property interests are determined under state law.  *Butner v. United States*, 440 U.S. 48 (1979).  In Kentucky, a permanent fixture is something that is properly fixed to the realty so that it becomes a part or parcel of the realty, giving the owner of the realty the same rights to it as the soil itself.  *Bank of Shelbyville v. Hartford*, 268 Ky. 135, 104 S.W.2d 217 (1937).  *Tarter v. Turpin*, 291 S.W.2d 547 (Ky. App. 1956).

The leading case on this issue was decided by another bankruptcy judge in this district.  In that case, the court stated that the test for determining whether something was a fixture requires analysis as to whether the item was (1) annexed, either actually or constructively, to the property; (2) adapted to the use/purpose of the property to which it is connected so as to materially affect its use; and (3) intentionally made a permanent part of the property to which it was annexed.  *In re Heflin* (Fulton, J.), 326 B.R. 696, 701 (Bankr. W.D. Ky. 2005) (citing *Tarter v. Turpin*, 291 S.W.2d 547, 548 (Ky. 1956)).

In *Heflin*, the court determined that several items removed by the debtor from a home mortgaged to his credit union, which subsequently foreclosed on the property, were fixtures. The items included the HVAC unit, a back deck, front ramp and porch with rails, a chain-linked fence surrounding the property and blinds on the windows. After the debtor filed for bankruptcy, the credit union brought a nonchargeability action under 11 U.S.C. § 523(a)(4) and (6) based on debtor's wrongful removal of the items which it claimed were subject to its security interest. The debtor contended the items were not fixtures and not subject to the credit union's security interest.

The court in *Heflin* determined that all items, except the blinds, were annexed to the property. The first element of the test was met as the debtor had removed portions of the deck, ramp and fence even though the items were made of concrete or affixed to the property with concrete. The debtor simply removed portions of the structures that could be taken down, while leaving the portions that could not be removed. The court stated, "it is inconsequential that the item was attached to the property and not the house as the mortgage covered all improvements to the house and property. . . . Simply because something, or part of something could possibly be removed does not mean that it was not attached to the property under the fixture analysis." *Id.* at 702.

The *Heflin* analysis was also used by another bankruptcy court in this district to determine that several cabins placed on concrete slabs at a campground property were fixtures under Kentucky law. *See*, *In re Rolling Hills Camping Resort, Inc.* (Stosberg, J.), 460 B.R. 145 (Bankr. W.D. Ky. 2011). The cabins sat atop concrete slabs and at one time were affixed to the slabs by hurricane straps, which had been removed at some point. Utility connections in each cabin attached the cabin to the ground. The court, relying on *Heflin* determined that simply because the cabins could be removed by disconnecting the utility lines and cutting the straps, did not mean the cabins were not

fixtures attached to the property. "Even though an object can be moved does not mean it is not a fixture." *Id.* at 148.

In this case, the barns were actually annexed to the property by posts with rebar connected to the concrete foundation in one case and by wooden posts which sat atop piers on a two foot deep concrete foundation in the realty on the other. The enormous weight and size of the barn structures for all practical purposes affixed them to the realty. The trial testimony supports a finding of annexation.

The second element in the analysis is that the item was adapted to the use/purpose of the property to which it is connected so as to materially affect its use. In *Heflin*, the court determined that removal of each item, except the blinds, materially affected the property and the way in which it was used. A better illustration of application of this part of the test is shown in the *Rolling Hills'* case. There, the court determined the cabins constituted an integral component of the campground operation. Removal of the cabins would materially affect the value of the campground property. Otherwise, the property would essentially be a vacant lot with utility poles jutting out of the ground. *Rolling Hills*, 460 B.R. at 148.

Similarly, in this case, the destruction of the pole barns materially affected the value of the Farm. Debtor acknowledged this fact in his underlying bankruptcy case in his Motion to Use Cash Collateral (Dkt. #46, Case No. 17-10067)[1], in which he acknowledged that SCB had no security interest in the barns and he had no idea why they were listed as payees on the insurance checks. Debtor further stated in the Motion that because ESB had a first mortgage on the Farm, the insurance

---

[1]Debtor later withdrew the Motion to Use Cash Collateral after ESB filed a motion seeking an order requiring Debtor to Release the insurance proceeds on the barns.

checks for the barns added value to ESB's collateral.  Clearly, the addition of the pole barns to the Farm increased the value of the entire farm.  Witness Dakota Elmore, an auctioneer, testified that if he had been hired to auction Debtor's property, and Debtor had indicated he was going to dismantle the pole barns and move them to another property, he would have advised against it as such action would negatively impact the value of the Farm and its use as a tobacco farm.  The trial testimony supports the finding that ESB met the second element of the test.

Finally, it is clear from the trial testimony that the pole barns were intended to be a permanent part of the Farm.  The method of construction of the barns is evidence that they were meant to be permanent.  The use of the pole barn nails, as well as the concrete foundations, established that they were not meant to be dismantled and removed, and such action would have destroyed the structures and would not have been economically feasible.

On the permanency of the structure, the Court also finds relevant the fact that Debtor's insurance policy with ECM, did not classify the pole barns as personal property, but instead included them on Schedule E–Schedule of Barns, Buildings, Structures and Additional Farm Buildings.

Although Debtor testified that he intended to dismantle the barns and move them to a new farm once he decided to quit tobacco farming, the Court does not find this testimony credible.  The Debtor's father testified that he had never heard his son express this intention and that he as well as Mr. Elmore, a 75 year old tobacco farmer in the area, testified they had never heard of anyone moving such structures to other farms.  Additionally, Debtor had two other smaller barns on the Farm.  He never tried to classify these barns on the Farm as personal property, never tried to dismantle and move them, and in fact, sold them as part and parcel of the Farm in his bankruptcy case.

The Court finds, based on the overwhelming evidence presented at trial, that Debtor intended the two tobacco pole barns to be permanent fixtures to the Farm and that they were an integral part of the tobacco farming operation. In *Heflin*, the Court framed the issue as whether an item, as a whole, was intended to be part of the larger property. *Heflin*, 326 B.R. at 702. The Court is convinced by the testimony regarding the structure of the barns, the way in which they were constructed and their use that they were integral to Debtor's tobacco farming operation and meant to be permanent fixtures to the Farm.

SCB, Pinnacle and Debtor all contend the barns were personal property. In support of their cases, they rely on several Kentucky cases and cases from other jurisdictions. Most of these cases, however, arise out of the removal of property by a tenant from property leased from a landowner. The item involved was usually a trade fixture. SCB down plays the effect of the landlord/tenant relationship in these cases where the annexation of personal property resulted in a finding that the property retains its characteristics as personal property. The effect of the landlord/tenant relationship cannot be ignored, however, in those cases.

In the cases relied upon, the courts tended to rely heavily on the agreement of the parties, the use of the property, with the key factor being the intention of the parties. *See*, *Batson v. Clark*, 980 S.W.2d 566, 574 (Ky. App. 1998). The rule in Kentucky is as between landlord and tenant "the greatest latitude and indulgence is given to the claim that fixtures attached to the realty by the tenant remain personal property." *Warren Post No. 23, Am. Legion v. Jones*, 302 Ky. 861, 196 S.W.2d 726, 729 (1946) citing, *Bank of Shelbyville v. Hartford*, 268 Ky. 135, 104 S.W.2d 217; *Schultz v. Seiller Motor Car Co.*, 243 Ky. 459, 48 S.W.2d 1068. The holdings of these cases rely primarily on the intention of the parties to the lease contract. In such cases, the courts do not rely heavily on

the nature of the property involved or the manner of attachment to the realty.  The facts of the case at bar do not fall within the landlord/tenant analysis and its heavy reliance on the intent of the parties to a lease agreement.  For these reasons, these cases are distinguishable and not applicable to the facts before the Court.

## CONCLUSION

ESB met its burden of proof in meeting the required elements of the three part test of *Heflin* to characterize the tobacco pole barns as permanent fixtures to the realty.  As such, the insurance checks issued by ECM following the destruction of the barns constitute a part of the collateral of ESB under its mortgage with the Debtor.  Therefore, the two insurance checks from ECM in the amount of $129,000 and $130,000 must be turned over to ESB as they do not constitute the collateral of SCB or Pinnacle.  A separate Order incorporating the findings herein will be entered with this Memorandum.

Joan A. Lloyd
United States Bankruptcy Judge
Dated:  December 6, 2017

# UNITED STATES BANKRUPTCY COURT
## FOR THE
## WESTERN DISTRICT OF KENTUCKY

| | | |
|---|---|---|
| IN RE: | ) | |
| | ) | |
| CHRISTOPHER LEE SMITH | ) | CASE NO.  17-10067(1)(12) |
| | ) | |
| Debtor(s) | ) | |
| | ) | |
| EDMONTON STATE BANK | ) | AP NO.  17-1010 |
| | ) | |
| Plaintiff(s) | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| CHRISTOPHER LEE SMITH, *et al.* | ) | |
| | ) | |
| Defendant(s) | ) | |

## ORDER

Pursuant to the Memorandum entered here in this date and incorporated herein by reference, and the Court being duly advised in the premises,

**IT IS HEREBY ORDERED, ADJUDGED AND DECREED** that the two tobacco pole barns located on the farm of Debtor Christopher Lee Smith that were destroyed by a windstorm on December 17, 2016 were permanent fixtures annexed to the Debtor's farm.  Therefore, Edmonton State Bank, having a valid mortgage on Debtor's property, and ECM Insurance Company having issued two checks for the loss of the barns, one for $129,000 and one for $130,000, is the owner of the two checks which constitute part of its collateral from Debtor Christopher Lee Smith. Therefore, the insurance checks are the property of Edmonton State Bank.

_____
Joan A. Lloyd
United States Bankruptcy Judge
Dated:  December 6, 2017